**HARLEM VALLEY TRANSPORTATION ASSOCIATION et al., Plaintiffs,**

v.

**George M. STAFFORD, Chairman, Interstate Commerce Commission, Individually and in his Designated Official Capacity, et al., Defendants.**

**No. 73 Civ. 1330.**

United States District Court,
S. D. New York.

June 21, 1973.

William Hoppen, Ardsley-on-Hudson, N. Y., for plaintiffs, Harlem Valley Transportation Association, and others.

Thomas L. Creel, New York City, for plaintiff, Natural Resources Defense Council, Inc.; Stuart J. Sinder, New York City, of counsel.

Fritz R. Kahn, Gen. Counsel, Arthur J. Cerra, Deputy Gen. Counsel, James F. Tao, Atty., Interstate Commerce Commission, Washington, D. C., for the Interstate Commerce Commission.

Paul J. Curran, U. S. Atty., for the Southern District of New York, New York City, for defendants; Christopher Roosevelt, Daniel Riesel, Asst. U. S. Attys., of counsel.

FRANKEL, District Judge.

Plaintiffs seek declaratory and injunctive relief against alleged violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970) ("NEPA"), in the procedures attendant upon abandonments of rail lines under the jurisdiction of the Interstate Commerce Commission. The plaintiffs are an array of public-interest corporations and associations, business corporations, and individuals variously interested in continued rail service, the quality of the air they breathe, and the quality of their environment more generally. They invoke the jurisdiction of this court under an array of statutes only some of which need be mentioned, as they are in the margin.[1]

1. Defendants have not questioned the jurisdiction of the district court except for the contention of the ICC that the case should be before three judges rather than one. That contention is discussed and overruled at a later point in the text of this opinion. As to the grounds of jurisdiction apart from that, the court holds that the case is properly here at least under 28 U.S.C. § 1361 (1970), the so-called mandamus provision. See, e. g., Roberts v. United States, 176 U.S. 221, 231, 20 S. Ct. 376, 44 L.Ed. 443 (1900); Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir. 1971); Peoples v. United States Department of Agriculture, 138 U.S.App. D.C. 291, 427 F.2d 561, 565 (D.C.Cir. 1970); Earls v. Resor, 327 F.Supp. 354 (S.D.N.Y.1970); Carey v. Local Bd. No.

2, Hartford, Conn., 297 F.Supp. 252 (D. Conn.), aff'd, 412 F.2d 71 (2d Cir. 1969).

Additional or alternative bases for the jurisdiction of the court would appear to exist in the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1970), see Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 101–102 (2d Cir.), cert. denied, 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1970); Kletschka v. Driver, 411 F.2d 436, 445 (2d Cir. 1969); Toilet Goods Ass'n v. Gardner, 360 F.2d 677, 679 n. 1 (2d Cir. 1966), aff'd, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), along with (or as well as) 28 U.S.C. § 1331 (1970).

It is of at least passing interest to note that the complaint in Hanly v. Mitchell,

In a complaint amended speedily during the pendency of motions now to be decided, the plaintiffs seek to maintain the proceeding as a class action under Fed.R.Civ.P. 23(b)(2), alleging that they can and do represent

"those adversely affected by the failure of defendants to carry out their statutory duties under the National Environmental Policy Act * * * with regard to the proposed abandonment of rail lines in the Northeast and in the United States and in the performance of their administrative duties under the law, particularly as they relate to restructuring of railroads in the Northeast, and generally those citizens and residents of the United States who are or who will be injured by the abandonment of rail service and rail lines in particular states of the United States in which such abandonments are or may be proposed by the carriers and approved by the Interstate Commerce Commission without compliance with the law aforesaid."[2]

Defendants are the ICC, its Chairman, and, unimportantly for present (and probably all) purposes of this case, the Administrator of the Environmental Protection Agency.[3]

Plaintiffs have moved for a temporary injunction. Simply but sufficiently stated for introductory purposes, their prayer is that the ICC be enjoined pendente lite from going forward with proposed rail abandonment proceedings unless a draft environmental impact statement has been prepared and circulated by the Commission staff prior to any hearings as required, according to plaintiffs, by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

According to the complaint and essentially undisputed portions of the motion papers, there are now pending, in the northeast and elsewhere across the country, a number of proceedings and proposed proceedings under 49 U.S.C. § 1(18)–(20) (1970) wherein the ICC is asked to approve abandonment of all or portions of lines of railroads or the operation thereof. Such abandonments, if allowed, will or may in specific cases

---

460 F.2d 640 (2d Cir.), cert. denied, Hanly v. Kleindienst, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972), another controversy concerning NEPA procedures, invoked a number of jurisdictional bases, including NEPA itself, which seem to have been so clearly sufficient that neither Judge Tenney in this court nor the Second Circuit in its review appears to have found occasion to deal expressly with the subject.

2. In order to supply clarification of plaintiffs' class-action allegations and to make more precise some subjects discussed during oral argument, the court suggested the filing of an amended complaint at the hearing of the motion for a preliminary injunction on June 6, 1973. The defendants have raised the technical objection that "leave" for such an amended pleading had not been given. In the circumstances, the objection is without merit. Leave is now given to do what the court proposed.

Furthermore, the subject has become inconsequential. One of the court's main concerns during the hearing of the motion for a preliminary injunction was the question whether the plaintiffs, if they could

prove entitlement to any relief, could legitimately seek a restraint of nationwide effect when their alleged interests might be of narrower geographic scope. Both the United States and the ICC have now not only conceded, but insisted, that a preliminary injunction in this case would "affect the agency in the entire scope of its authority and jurisdiction." Defendants' Supplemental Memorandum 4. Reiterating this, the defendants say:

"Any action by this Court based on plaintiffs' individual interests and the public interest will affect the agency's procedures and the application of said procedures anywhere within the scope of the agency's jurisdiction." *Id.* at 4–5.
In these circumstances, it becomes unimportant to decide at this early stage whether the action may proceed as a class suit. The court will, therefore, leave this determination to be made in the normal course pursuant to our District's Civil Rule 11A(c).

3. It was acknowledged in oral argument that no relief is now sought against the EPA through the motion being decided today.

have environmental impacts of varying kinds and degrees, most importantly perhaps on air quality because of the increased pollution produced by increased truck and auto traffic. In addition, though less significantly for our immediate concerns, plaintiffs charge that the ICC is considering individual abandonment proposals in isolation from each other and that the failure to consider effects "on the rail transit system as a whole is in violation of national environmental policy and * * * national transportation policy."

Of direct interest at the moment is plaintiffs' claim of non-compliance with NEPA § 102(2)(C), which provides:

"The Congress authorizes and directs that, to the fullest extent possible * * * (2) all agencies of the Federal Government shall—

* * *

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes."

To particularize plaintiffs' claim as it came to be specified in the course of briefing and oral argument, they concede that (a) an environmental impact statement is required only for "major Federal actions significantly affecting the quality of the human environment," (b) the threshold determination whether an "action" falls within this class is, at least initially, for the responsible agency, and (c) a negative decision on this question in any particular abandonment proceeding may be deemed beyond the reach of the injunctive relief sought herein. What plaintiffs assail is the ICC's view that NEPA § 102(2)(C) requires no agency action in an abandonment proceeding until the initial decision, *following a hearing,* by the administrative judge. It is plaintiffs' contention that the agency must (1) determine at the outset if the particular proceedings involve "major Federal actions significantly affecting the quality of the human environment," and, if the answer to that is affirmative, (2) require its staff to prepare and circulate a draft impact statement prior to the commencement of any hearing, so that evidence and argument may be adduced with reference to the draft. In their motion now to be decided plaintiffs seek a preliminary injunction enforcing these contentions.

Opposing the motion on the merits, the ICC argues that NEPA "does not require the issuance of an environment impact statement prior to any hearing

on a proposed abandonment."[4] In this, reflecting one of the recurrent but still quaint charms of our political and legal system,[5] the executive comes disunited to the courthouse: the "United States," as the Department of Justice is permissibly styled, shares plaintiffs' view that a draft impact statement is required before the hearing.[6] On a logically prior question, however, the two agencies are agreed that plaintiffs' action, or at least their pending motion, must be rejected. Thus, both the ICC and the Department of Justice argue that the suit is barred because of failure to exhaust administrative remedies.

To this threshold defense, the ICC alone adds two others:

(1) The action is properly for a three-judge court under 28 U.S.C. §§ 2284 and 2321–2325 (1970), with the United States as a defendant, so that plaintiffs have erred fatally in (a) coming to a single district judge and (b) failing to name the United States as a defendant.

(2) The plaintiffs lack standing.

It is convenient, if not compulsory, to treat the issues in a legally logical order.

**1. *A three-judge court is not required.***

■■ This subject is not without interest and complexity. The court concludes, however, that it is suitable for narrow decision in the circumstances of this case, and that the claimed requirement of three judges is not applicable.

The position that this case is for a three-judge court had its inception when plaintiffs were thought to be attacking orders of abandonment already issued.[7]

It became clear, however, in the course of hearing the present motion, that no such attack was genuinely intended. Plaintiffs have now conceded that they are not seeking in this action to enjoin or set aside any authorizations already issued by the ICC allowing abandonment of lines or their operation.

A further limitation on the nature of the issue should be noted. The ICC claims that its regulation governing this matter does not call for a draft impact statement at the initial stage when plaintiffs claim it is required. The position is that this suit seeks to invalidate "procedures * * * prescribed by an agency order * * * [which] may only be attacked by a three-judge district court which alone possesses the authority to enjoin or set them aside."[8] The Commission invokes for this argument such cases as Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956), and Lambert Co. v. Balt. & Ohio R. R. Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922).

It is perhaps a sufficient answer that the cases on which the ICC relies involved regulations having the nature of substantive law—i. e., being determinative or dispositive of substantive rights rather than procedural incidents in the administrative process. See also Columbia System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

Whether or not that is sufficient, another circumstance seems important in this case. The ICC acknowledges that at the time of the decision of Greene County Planning Bd. v. Federal Power Commission, 455 F.2d 412 (2d Cir.),

---

4. ICC Memorandum of Law in Opposition 18.

5. Cf., e. g., Secretary of Agriculture v. United States, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173 (1956); United States v. I.C.C., 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949).

6. Without dissent from any party or the court, separate briefs have been filed and separate counsel have appeared for Justice and the ICC.

7. As noted earlier, the pertinent statutes are 28 U.S.C. §§ 2284 and 2321–2325 (1970). The focus is, of course, on 28 U.S.C. § 2325, which provides for a three-judge court determination of an application for an interlocutory injunction "restraining the enforcement, operation or execution, in whole or in part, of *any order* of the Interstate Commerce Commission" (emphasis added).

8. I.C.C. Memorandum of Law in Opposition 6b.

cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), now found to be controlling in this case (see *infra*), there was no ICC regulation governing the procedural question before us. On the contrary, the ICC at that time represented, both to our Court of Appeals and to the Supreme Court, that *Greene County*, unless overturned, would require draft impact statements at the outset of the hearings in ICC cases. The ICC concedes that if the situation had remained in that posture, there being no regulation providing a procedure different from that ordered by *Greene County*, this would be a proper case for a single judge rather than three judges.

In these peculiar circumstances, it seems insubstantial to claim that the ICC's adoption of a supervening regulation, assertedly altering what it saw *Greene County* to state, should aggrandize this case to the status of one under the Urgent Deficiencies Act.

Finally, quite apart from this peculiarity of this specific case, there is apposite precedent limiting the Urgent Deficiencies Act jurisdiction. Three-judge court review will not lie where the order complained of is "one which does not command the [party] to do, or to refrain from doing, any thing; which does not grant or withhold any authority, privilege or license; which does not extend or abridge any power or facility; which does not subject the [party] to any liability, civil or criminal; which does not change the [party's] existing or future status or condition; which does not determine any right or obligation." United States v. Los Angeles R. R., 273 U.S. 299, 309–310, 47 S.Ct. 413, 414, 71 L.Ed. 651 (1927). See also Columbia System v. United States, *supra.* In this case no rights have been determined by the administrative action in question. The effort, as hereinafter characterized, is simply one to enforce compliance with a plain legal requirement governing the agency's proceeding. It follows, therefore, within the rule of Kansas City So. Ry. v. I.C.C., 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517 (1920),

that this is a proper case for consideration of mandamus by a single judge rather than the kind of cumbersome review (with direct access to the Supreme Court) provided for cases within the Urgent Deficiencies Act.

2. *The exhaustion doctrine is not a bar.*

The ideas of "exhaustion" and "finality" as prerequisites for review of administrative orders are sometimes amorphous and sometimes difficult to keep neatly separate. See Gellhorn & Byse, Administrative Law 213 (5th ed. 1970). So the court should not and does not claim certainty when it expresses the view that defendants here probably mean to be claiming non-finality rather than failure to exhaust in their contention that this action is premature. See Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584, 589 n.8, 591 (1971). At any rate, however denominated, the argument is unsound.

It seems sufficient to cite for this point, as well as the merits, the decision in Greene County Planning Bd. v. Federal Power Commission, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). There, in the early stages, the Federal Power Commission sought dismissal of the review proceeding upon the asserted ground that the order refusing a draft impact statement under NEPA was "interlocutory" and therefore unreviewable. While that argument was dropped when the case came to be briefed on the merits, a similar position was taken with respect to the Commission's order denying petitioner's request for attorneys' fees and expenses for conducting the administrative proceeding. The Court of Appeals rejected the argument and reviewed the question of fees and expenses. 455 F.2d at 425–426.

The reasons making both the NEPA and the fees-and-expenses questions reviewable there are applicable here. The NEPA problem is substantially identical. The other question in *Greene County* is identical in principle. The orders

in each instance are complete, likely to wreak irreparable injury if wrong,[9] and effectively reviewable only now rather than later. See also Environmental Defense Fund, Inc. v. Ruckelshaus, *supra* 439 F.2d at 589, 592 n.20.

3. *Plaintiffs make a sufficient showing of standing.*

■ Various members of the plaintiff organizations and the other plaintiffs, all of whom reside or have businesses located in the Harlem Valley region, have submitted affidavits alleging injury from the defendants' failure to comply with both procedural and substantive NEPA requirements. As to the specific matter of a draft impact statement, plaintiffs contend that they have limited resources, and will be unable effectively to present and analyze environmental factors at the hearings in the absence of such a statement prepared in advance by the ICC staff. The hearing records on environmental considerations are therefore likely to be inadequate, enhancing the prospect of improvident abandonments approved at unlawful costs in environmental injury. Consequently, as residents of the Harlem Valley, plaintiffs contend they will be made wrongfully to suffer from increased noise and air pollution caused by increased truck traffic. In addition, plaintiffs allege both economic injury and personal inconvenience from the loss of rail transportation.

■ These assertions are sufficient, and sufficiently documented for present purposes, to confer standing. United States v. Students Challenging Regulatory Agency Procedures, —— U.S. ——, ——, ——, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few

does not make them less deserving of legal protection through the judicial process." Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

It is clear, as shown in the two Supreme Court decisions just cited, that plaintiffs' alleged injuries are within the zone of interests protected or regulated by NEPA. Cf. Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). The congressional purpose in promulgating NEPA was, in part, to "promote efforts which will prevent or eliminate damage to the environment * * * and stimulate the health and welfare of man," 42 U.S.C. § 4321. NEPA proclaims the "critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," 42 U.S.C. § 4331(a). It decrees that "each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment," 42 U.S.C. § 4331(c). Those are the ultimate substantive goals to which NEPA, including its provisions for impact statements, is addressed.

■ The plaintiff organizations have standing to sue on behalf of their injured members. See Sierra Club v. Morton, supra 405 U.S. at 739, 92 S.Ct. 1361. Without depreciating the role of any plaintiff, we may note that the Natural Resources Defense Council (NRDC), a non-profit national organization with approximately 10,000 members or contributors, is particularly fitted to bring this suit for its members. As part of its activities, the NRDC has long been concerned with NEPA problems. It has repeatedly participated in the formulation of agency rules implementing NEPA, including rules of the Council on Environmental Quality. In addition, NRDC has participated in hearings and

---

9. The term "irreparable" may be literally debatable, but it applies here as it did in *Greene County*. There as here, the agency's action, if erroneous, could later have been "repaired" by having the hearing process done all over after reversal of a "final" order.

public review of proposed highway transportation plans, engaged in a year-long survey of federal energy policy decision-making, and prepared and disseminated educational materials concerning provisions of the significant 1970 amendments to the Clean Air Act, 42 U.S.C. § 1857 et seq. As part of the latter project, NRDC representatives have testified at Senate hearings overseeing implementation of the amendments and engaged in litigation testing the Environmental Protection Agency's interpretation of those amendments. In sum, the interest and expertise of this plaintiff, when exerted on behalf of its directly affected members, assure "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult * * * questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

4. *Plaintiffs are entitled to a temporary injunction.*

As mentioned earlier, the merits of this case have opened fissures in the executive ranks. The divisions have been not only spatial, as it were, among the agencies, but seemingly even temporal, within a single agency. After the decision in Greene County Planning Board v. Federal Power Commission, supra, the ICC sought leave to file an amicus brief on the petition for rehearing en banc, arguing that the decision, "if allowed to stand [would] compel a substantial number of * * * agencies—including the Interstate Commerce Commission— * * * to assign a staff of employees to the task of preparing [draft impact] statements * * *." The Solicitor General, in his unsuccessful petition for certiorari, spoke to the same effect, noting expressions of "particular concern" by the ICC and the CAB if the *Greene County* decision remained unreversed. Moreover, before the certiorari petition was filed, the ICC apparently found itself constrained (and able) to file a draft impact statement prior to hearing in an abandonment proceeding, "conso-

nant with [the procedure] mandated in" *Greene County*. City of New York v. United States, 344 F.Supp. 929, 939 (E.D.N.Y.1972) (3-judge court).

Upon further study the ICC claims to have managed (while the Justice Department has failed) to find its situation distinguishable from *Greene County*. The fact of a shift does not, of course, serve in itself to invalidate the new position. Upon inspection, however, the Commission's arguments fail to avoid the squarely controlling authority of *Greene County*, by which this court is bound. Indeed, most of the arguments now tendered were explicitly rejected in the decision of the Second Circuit. To the extent this is not literally the case, the ICC's contentions are not in any event substantial. So, for example, the agency urges that its staff, unlike the Federal Power Commissions's, does not participate in the hearing before the administrative judge. Hence, it is argued, nobody is there to make a draft impact statement—or, in the language of the ICC brief (p. 25), "the *Greene County* requirement that an impact statement be served by the participating agency staff member prior to the hearing is entirely inappropriate."

The short answer is the one the ICC perceived, though without joy, in its amicus presentation on the *Greene County* petition for rehearing. As that brief complained, the rule of *Greene County* required the assignment of staff members—"an assignment for which," the ICC protested, "there are no budgeted funds and no authorized increase in personnel." In turning a deaf ear to that plea, the Circuit may have deemed sympathy an inapposite response. Compliance with the law frequently entails expense as well as other strains. It is to be hoped that the creative flexibility of the administrative agency can encompass the locating of personnel (as it already has in one instance mentioned above) for such fundamental purpose.

In sum, plaintiffs' motion will be granted. The court will order the

ICC (1) to determine at the outset of abandonment proceedings whether "major Federal actions significantly affecting the quality of the human environment" are involved within the meaning of 42 U.S.C. § 4332(2)(C), and, if so,

(2) to require staff preparation of a draft impact statement for circulation to the parties and further use in the agency process as the statute requires.[10]

 Settle order.[11]

10. It is not necessary to decide today what may happen if there is a dispute in some instance over an initial ICC determination that a particular case is not in the category of "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332 (2)(C), thus obviating the need for an impact statement. The determination would be open, of course, to judicial scrutiny. Hanly v. Mitchell, 460 F.2d 640 (2d Cir.), cert. denied, Hanly v. Kleindienst, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972). But we need not consider whether such a specific ruling in a particular case, involving particular facts and, presumably, a particular exercise of judgment, would be immediately reviewable, by mandamus or otherwise.

11. The Baltimore & Ohio Railroad Company and the Chesapeake & Ohio Railway Company (B & O and C & O), the trustees of the property of Penn Central Transportation Company (Penn Central) and the trustees of the property of Erie Lackawanna Railway Company (Erie) have sought to intervene as defendants in this action. The Association of American Railroads requests leave to appear as amicus curiae. The United States opposes the intervention applications.

At oral argument, Penn Central agreed that its motion to intervene should be denied, without prejudice to its renewal at a later date, and asked leave to appear as amicus curiae. Such leave is now granted to both Penn Central and the Association of American Railroads.

As for Erie, this movant has not accompanied its "petition" to intervene with a proposed pleading that sets forth the defense for which intervention is sought. As appears just below, the grounds for allowing intervention are far from self-evident. Erie's application is denied, without prejudice to later renewal upon proper submissions.

Finally, as to B & O and C & O: These companies first assert a right to intervene under Fed.R.Civ.P. 24(a)(1) because the plaintiffs' complaint seeks both to restrain implementation of final abandonment orders and to challenge the ICC's regulation implementing NEPA, 49 C.F.R. § 1100.250 (1973); therefore, movants argue, a three-judge court is required by the Urgent Deficiencies Act and they have a right to intervene under 28 U.S.C. § 2323 (1970). As noted, however, plaintiffs concede that the relief sought in no way affects final abandonment orders already issued by the ICC, and the Urgent Deficiencies Act is inapplicable to this case. There is, then, no right to intervene under 24(a)(1). The B & O and C & O also assert a right to intervene under Rule 24(a)(2). Granting, however, that they have an interest of the requisite character, the materials now presented indicate that these movants are "adequately represented" (within the terms of the Rule) by the ICC, at least for purposes of the pending motion for a preliminary injunction. Cf. Chance v. Bd. of Examiners, 51 F.R.D. 156, 158–159 (S.D. N.Y.1970). This may change, of course, if and when the action proceeds further. As to the application for leave to intervene under Rule 24(b), no sufficient basis is shown for such discretionary relief at this time. In sum, the B & O and C & O motions will be denied without prejudice to later renewal.