500 F.2d 328
 6 ERC 1855, 4 Envtl. L. Rep. 20,638
 HARLEM VALLEY TRANSPORTATION ASSOCIATION et al., Plaintiffs-Appellees,
v.
George M. STAFFORD, Chairman, Interstate Commerce
Commission, Individually and in his Designated
Official Capacity, and Interstate
Commerce Commission of the
United States,
Defendants-
Appellants.
 No. 685, Docket 73-2496.
 United States Court of Appeals, Second Circuit.
 Argued March 20, 1974.
Decided June 18, 1974.
 
 William Hoppen, Ardsley-on-Hudson, N.Y. (Murray A. Gordon, New York City, N.Y., on the brief), for Harlem Valley Transp. Assn., and other plaintiffs-appellees.
 Thomas L. Creel, New York, City, (Stuart J. Sinder, New York City on the brief), for Natural Resources Defense Council, Inc., plaintiff-appellee.
 Edmund B. Clark, Atty., Dept. of Justice, Washington, D.C. (Wallace H. Johnson, Asst. Atty. Gen., and Henry J. Bourguignon, Atty., Dept. of Justice; Fritz R. Kahn, Gen. Counsel, and Arthur J. Cerra, Deputy Gen. Counsel, ICC, Washington, D.C., on the brief), for defendants-appellants.
 Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., Philip Weinberg and Thomas F. Harrison, Asst. Attys. Gen., New York City, on the brief for the State of New York, joined in by the States of Connecticut, Massachusetts, Pennsylvania and the City of Boston as amici curiae in support of appellees.
 William M. Moloney, Carl V. Lyon and John B. Norton, Attys. for Assn. of American Railroads, Washington, D.C. and George J. Schwarz, New York City, on the brief as amicus curiae in support of appellants.
 Before LUMBARD, FEINBERG, and MULLIGAN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 The Interstate Commerce Commission (ICC) and its chairman, George M. Stafford, appeal from an order entered on July 6, 1973, in the Southern District of New York, which granted plaintiffs' motion for a preliminary injunction. The plaintiffs, a group of public-interest associations, business firms and individuals who claim that they or their members will be injured economically and inconvenienced if rail service in the Northeast is terminated, instituted this action against Stafford, the ICC, and the Administrator of the Environmental Protection Agency on March 30, 1973. They claim that the ICC's procedures under authority given it by the Interstate Commerce Act, see 49 U.S.C. 1(18), for determining whether railroads should be permitted to abandon service on any lines, violated the National Environmental Policy Act (NEPA), 42 U.S.C. 4321-4347. On May 16 plaintiffs moved for a preliminary injunction which would bar the ICC from going forward with any rail abandonment proceedings unless its staff had prior to any hearings prepared a draft environmental impact statement when the abandonments would be 'major Federal actions significantly affecting' the environment as required by NEPA 102(2)(C), 42 U.S.C. 4332(2)(C). In an opinion issued on June 21, 1973, and reported at 360 F.Supp. 1057, Judge Frankel held that a single judge had jurisdiction to issue such an injunction and that under our decision in Greene County Planning Board v. FPC, 455 F.2d 412 (2d Cir.), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972) (Greene County I), plaintiffs were entitled to an injunction. We affirm.
 
 I.
 
 2
 As was noted in City of New York v. United States, 337 F.Supp. 150, 158 (E.D.N.Y. 1972) (City of New York I), the ICC has been slow in reacting to the directives of NEPA. On January 14, 1972, some two years after NEPA's effective date, the Commission promulgated a regulation to implement the requirements of NEPA as it saw them. Implementation of Public Law 91-190, National Environmental Policy Act of 1969 and Related Requirements, 340 I.C.C. 431 (1972) (codified at 49 C.F.R. 1100.250). The regulation required that all initial papers filed with the ICC by a party should indicate whether the requested action would have an effect on the quality of the human environment. If any effect is alleged to be present, all parties must submit statements concerning the five factors that NEPA requires be evaluated in impact statements. 49 C.F.R. 1100.250(d). When the proposed action is determined to have a significant environmental impact, a detailed impact statement will be made as part of the initial determination by an administrative law judge, which will become final (with or without modification) when the Commission enters its final order.
 
 
 3
 The Commission's report accompanying the regulation makes it clear that no draft impact statement prepared by the Commission's staff will be circulated prior to the hearings before an administrative law judge:
 
 
 4
 The guidelines finally adopted by the Council on Environmental Quality . . . require each agency responsible for a major Federal action significantly affecting the quality of the human environment to prepare and circulate to the Council and other appropriate government agencies a draft environmental impact statement. A final impact statement is to be similarly prepared and circulated after comments have been received on the draft statements. The essential question to be resolved at this point, which has been specifically raised by (the Department of Transportation), concerns the methods which this Commission should utilize in issuing draft and final environmental impact statements. All Commission hearings (whether oral or on the written record) in proceedings involving environmental issues will be public ones subject to the Administrative Procedure Act. We believe, and the Council has informally advised, that draft impact statements are not necessary in any of these proceedings. As a consequence, and in compliance with the Council's requirements, an environmental impact statement will be issued together with and as part of each initial determination made as a result of any hearing (oral or written), in those cases determined to involve environmental issues. The impact statement and initial determination will be circulated to the appropriate government agencies and made available to the public in the manner prescribed by the Council.
 
 
 5
 340 I.C.C. at 441-42.
 
 
 6
 While the Commission promulgated its regulation on January 14, 1972, the report and regulation were not printed and served until February 3. In the interim, on January 17, this court decided Greene County I. There the Federal Power Commission (FPC) in contested cases had not required its staff to prepare draft impact statements prior to hearings but instead required an applicant to submit its own detailed statement on the five factors which NEPA requires be evaluated. Relying on the language in NEPA 102(2) (C) that provides that an impact statement 'shall accompany the proposal through the existing agency review processes,' we held that the FPC's procedure did not comply with NEPA. We noted that there was a danger of reliance on self-serving assumptions made by the applicant in the FPC's procedures. We also said that the FPC's procedure might place the burden of providing effective analysis of environmental factors on intervenors whose resources generally are limited instead of upon the Commission as Congress intended. 455 F.2d at 420-421. The then-existing Council on Environmental Quality (CEQ) Guidelines, 36 Fed.Reg. 7724 (1971), supported the FPC's argument that its statement need not be circulated prior to any formal hearing, but we said that the guidelines flew in the face of the NEPA requirement that the statement accompany the proposal through the agency review processes, of which the hearings were certainly part. 455 F.2d at 421-422. Consequently, we held that the FPC staff must prepare a draft impact statement prior to hearings.
 
 
 7
 The ICC was not unaware of Greene County I. On February 18, 1972, it made a motion, which was denied, to submit a memorandum in support of the FPC's petition for a rehearing. The ICC memorandum stated that Greene County I would require it to change its procedures drastically. The Solicitor General in his petition for certiorari, which, as noted above, the Supreme Court denied, also stated that Greene County I would affect the ICC and other agencies as well as the FPC. Despite these concessions, the ICC made no effort to modify its procedures after certiorari was denied in Greene County I. Instead the ICC argued in the district court that Greene County I was distinguishable. Judge Frankel held that it was not. 360 F.Supp. at 1065. The Department of Justice in the district court agreed with plaintiffs that Greene County I was not distinguishable, but now argues before us that it is.
 
 
 8
 Subsequent to the district court's decision here, the CEQ on August 1, 1973, over the ICC's protest, promulgated new guidelines for implementing NEPA, which incorporated the requirements of Greene County I. 38 Fed.Reg. 20550. On December 27, 1973, the ICC petitioned the CEQ for an amendment of its guidelines. The ICC argued that following the guidelines would require a 20 percent increase in its staff and appropriations and would hamper the Commission's primary function of regulating transportation. The Commission also repeated its argument that it was not bound by Greene County I. In a letter dated February 25, 1974, Russell W. Peterson, Chairman of the CEQ, denied the requested amendment. He pointed out that while implementing NEPA would naturally take more staff effort no other agency had estimated that a 20 percent increase was required to meet the congressional mandate that environmental matters be considered. Peterson also asserted that NEPA does not require that an agency subordinate its primary mission to environmental consideration. On the matter of the timing of the impact statement, Peterson made a proposal which had been discussed with the ICC staff. Under this proposal, the administrative law judge would determine in the first phase of the hearing whether an impact statement was required under NEPA. If one was, he would recess the hearing and prepare the statement. The hearing would then resume and the public would be given opportunity to comment on the environmental issues, with the aid of the impact statement. We have not been informed whether any effort has been made to implement this suggestion.
 
 II.
 
 9
 Prior to reaching the merits of this case, we are faced with several procedural hurdles. The first of these, and the one urged most strenuously by the ICC, is that a single judge lacks jurisdiction to issue an injunction here since only a three-judge district court under the Urgent Deficiencies Act, 28 U.S.C. 2321-2325, can issue such an injunction. That statute provides that an interlocutory or permanent injunction restraining the enforcement, operation, or execution of any 'order' of the ICC shall not be granted unless the application is heard by a three-judge district court under 28 U.S.C. 2284.
 
 
 10
 It is clear that not every determination of the ICC is an 'order' for purposes of the Urgent Deficiencies Act. See, e.g., United States v. ICC,337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); Shannahan v. United States, 303 U.S. 596, 58 S.Ct. 732, 82 L.Ed. 1039 (1938); United States v. Los Angeles & S.L.R.R., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927); United States v. Illinois Cent. R.R., 244 U.S. 82, 37 S.Ct. 584, 61 L.Ed. 1007 (1917); New York, O. & W. Ry. v. United States, 14 F.2d 850 (S.D.N.Y.1926), aff'd per curiam, 273 U.S. 652, 47 S.Ct. 334, 71 L.Ed. 823 (1927). In determining that the regulation at issue here was not the sort of order for which review is provided under the Urgent Deficiencies Act, the district court relied, 360 F.Supp. at 1063, upon the definition contained in United States v. Los Angeles & S.L.R.R., supra. The Supreme Court there said that review will not lie under the Urgent Deficiencies Act when the 'order' complained of
 
 
 11
 does not command the carrier to do, or to refrain from doing, any thing; which does not grant or withhold any authority, privilege or license; which does not extend or abridge any power or facility; which does not subject the carrier to any liability, civil or criminal; which does not change the carrier's existing or future status or condition; which does not determine any right or obligation.
 
 
 12
 273 U.S. at 309-310, 47 S.Ct. at 414. This definition of 'order' may no longer be precisely accurate since decisions containing certain 'negative' orders are now reviewable, see Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939), as well as decisions declaring that certain carriers are subject to the jurisdiction of the ICC, see Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956). Be that as it may, we agree with Judge Frankel that a procedural regulation specifying the point at which in an abandonment proceeding the ICC must prepare its impact statement under NEPA is not the sort of determination that must be reviewed by a three-judge court under the Urgent Deficiencies Act.
 
 
 13
 The Supreme Court has 'frequently pointed out the importance of limiting the three-judge court procedure within its expressly stated confines.' United States v. ICC, supra, 337 U.S. at 443, 69 S.Ct. at 1420. The Supreme Court noted in United States v. Griffin, 303 U.S. 226, 58 S.Ct. 601, 82 L.Ed. 764 (1938), that the extraordinary remedy of a three-judge court was designed to 'guard against ill-considered action by a single judge and to avert the delays ordinarily incident to litigation' in cases of public importance and widespread effect. 303 U.S. at 233, 58 S.Ct. at 604. While the manner in which the ICC decides to implement NEPA may be of public importance, an injunction such as that granted by the district court will not seriously affect the public interest by preventing or obstructing action by the Commission under the Interstate Commerce Act. See United States v. Griffin, supra, 303 U.S. at 237, 58 S.Ct. 601. Requiring the ICC to prepare impact statements prior to hearings may inconvenience it but does not prohibit any effort by the Commission to regulate carriers subject to its jurisdiction. The policy behind the Urgent Deficiencies Act, therefore, does not extend to this case.[1]
 
 
 14
 Pennsylvania v. United States, 361 F.Supp. 208 (M.D.Pa.), aff'd mem., 414 U.S. 1017, 94 S.Ct. 440, 38 L.Ed.2d 310 (1973), comes closest to supporting the ICC's contention. There a challenge that was made to new ICC rules for disposing of railroad applications for abandonment was heard by a three-judge court. This decision does not, however, require that we conclude that a three-judge court is necessary here. First, the challenge to the rules at issue there was on the ground that they changed substantive law, not that they failed to meet the procedural mandate of another statute. Compare National Motor Freight Traffic Association, Inc. v. United States, 268 F.Supp. 90 (D.D.C.1967). Second, the opinion of the district court in that case does not even discuss the jurisdictional issue. We, therefore, cannot regard that decision as holding that a three-judge court is required here; in any event we conclude that one is not required.
 
 
 15
 The second procedural issue is whether we have jurisdiction to review the ICC's rules under some other statutory provision. We agree with the district court that this is a proper case for an 'action in the nature of mandamus' under 28 U.S.C. 1361. Many years ago the Supreme Court held that mandamus will lie for the failure of the ICC to perform a statutory duty, United States ex rel. Kansas City S. Ry. v. ICC, 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517 (1920). The issue here is whether the ICC has a statutory duty under NEPA to have its staff prepare impact statements when required by NEPA prior to any hearings. If there is such a duty, we can enforce it under 1361. See Leonhard v. Mitchell, 473 F.2d 709, 712-713 (2d Cir.), cert. denied,412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973); Langevin v. Chenango Court, Inc., 447 F.2d 296, 300 (2d Cir. 1971); Casarino v. United States,431 F.2d 775, 777 (2d Cir. 1970); Feliciano v. Laird, 426 F.2d 424, 429 (2d Cir. 1970); Safir v. Gibson, 417 F.2d 972, 978 (2d Cir. 1969), cert. denied, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88 1970); United States ex rel. Schonbrun v. Commanding Officer, Armed Forces, 403 F.2d 371, 374 (2d Cir. 1968), cert. denied, 391 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969). See generally Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and 'Nonstatutory' Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308 (1967).
 
 
 16
 As a final procedural argument, the ICC argues that judicial review should be barred for failure to exhaust administrative remedies. It is claimed that the Commission's rule should be evaluated in the light of how the Commission performs in specific cases. As the district court noted, 360 F.Supp. at 1063, the ICC's argument is probably more correctly subsumed under the rubric of finality or, perhaps, ripeness for review rather than exhaustion of remedies since the Commission has made its position clear on this matter. See McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).
 
 
 17
 The Supreme Court has said that 'the relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action.' Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed2d 203 (1970). Here there is no specific proceeding to disrupt since we are concerned with a rule that is applied to all ICC proceedings, and the ICC has determined, as it views them, its obligations under NEPA. This case is not like those in which we have recently dismissed petitions to review on the grounds of nonfinality. No interlocutory challenge to a specific environmental impact statement is made here, as was the case in Greene County Planning Board v. FPC, 490 F.2d 256 (2d Cir. 1973) (Greene County II), nor does this case involve the interlocutory exclusion of certain matters from a hearing as was the case in Ecology Action v. AEC, 492 F.2d 998 (2d Cir. 1974). See also New York Shipping Association, Inc. v. FMC, 495 F.2d 1215 (2d Cir. 1974). Rather we are asked to review a set of procedural rules for implementing NEPA that will apply to all ICC abandonment proceedings. In similar circumstances the District of Columbia Circuit has implicitly held that judicial review of the decision on how an agency will implement NEPA is proper. Calvert Cliffs' Coordinating Committee, Inc. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).
 
 
 18
 As far as ripeness for review is concerned, the issue here is the legal one of determining whether the ICC has complied with NEPA. The issue concerns all abandonment proceedings. A denial of review now would severely strain the financial resources of environmentalist intervenors, such as plaintiffs here, who would be forced to raise the issue of when the ICC must prepare its draft impact statement in the some 320 abandonment proceedings that were pending nationwide as of January 1974. A delay in review could have serious consequences to the ICC and all interested parties if a court later determined that the procedures the ICC had employed in several hundred proceedings were inadequate under NEPA. We, therefore, conclude that the matters presented here are ripe for judicial review and that we should reach the merits.[2] See generally Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
 
 III.
 
 19
 It is, of course, clear that the requirements of NEPA apply to railroad abandonment proceedings. City of New York I, supra, 337 F.Supp. at 158-160. The ICC does not claim otherwise, but instead it accuses the district court of engaging in a 'wooden application' of Greene County I, although at least two other courts have said or implied that Greene County I applies to the ICC. City of New York v. United States, 344 F.Supp. 929, 939 (E.D.N.Y.1972) (City of New York II); Students Challenging Regulatory Agency Procedures v. United States, 346 F.Supp. 189, 193 n. 4 (D.D.C.1972), rev'd for lack of jurisdiction, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).
 
 
 20
 The ICC and Association of American Railroads, as amicus curiae, claim that Greene County I is distinguishable because there it was clear that an impact statement was required while it is not clear in what particular ICC proceedings a statement may be required and because the FPC staff, unlike the ICC staff, participates in examining applications prior to hearings. Concerning the first alleged distinction, we shall develop below our belief that the Commission's staff must participate in the threshold determination of whether an impact statement is required. In any event, the policies behind the decision in Greene County I, the dangers that an agency will rely on self-serving statements by an applicant and will place the burden of analyzing environmental issues upon intervenors, apply with equal force here as in that case, even though there may be some initial doubt as to whether an impact statement is required.
 
 
 21
 As far as the second alleged distinction is concerned, it ignores the fact that in Greene County I we chided the FPC for not using its staff and quoted from our earlier decision in Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608, 614 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966):
 
 
 22
 'In this case, as in many others, the Commission has claimed to be the representative of the public interest. This role does not permit it to act as an umpire blandly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission.' 455 F.2d at 419. Moreover, the ICC has recognized elsewhere that it does have an affirmative duty under NEPA to evaluate environmental issues, for it has said: 'An agency's responsibility pursuant to the NEPA is not simply 'to (sit) back, like an umpire, and resolve adversary contentions at the hearing (stage). Rather, it must itself take the initiative of considering environmental values at every distinctive and comprehensive stage of (the) process." 340 I.C.C. at 440, quoting Calvert Cliffs', supra, 449 F.2d at 1119.
 
 
 23
 The steps, however, that the ICC has chosen to take in implementing NEPA just do not meet the burden imposed by this affirmative duty. The ICC is apparently content to place the burden on intervenors whose resources might be limited to challenge any environmental statements that the railroads might make in their applications for abandonment. If intervenors do not challenge these statements, they may be accepted as true. This passive approach by the Commission shifts to intervenors a large part of the burden of evaluating environmental issues which Congress placed on agencies of the government such as the ICC when it passed NEPA. This is precisely what we complained of in Greene County I. We also noted there that it is important that the agency's evaluation of environmental issues be made before any hearings on the merits so that this evaluation and the public's comments thereon would be considered before the initial decision since after that the chance of the public's meaningful participation decreases.
 
 
 24
 Furthermore, the ICC ignores that we held in Greene County I that the literal language of NEPA requires that impact statements be prepared prior to hearings since the statements must 'accompany the proposal through the existing agency review processes,' of which a public hearing under the Federal Power Act is a part. 455 F.2d at 421-422. We see no basis in the language of NEPA or the Interstate Commerce Act for not likewise holding that hearings required by the latter Act, see 49 U.S.C. 1(19), are part of the agency review processes. While NEPA only supplements the Interstate Commerce Act and does not repeal any part of it, United States v. Students Challenging Regulatory Agency Procedures, supra, 412 U.S. at 694, 93 S.Ct. 2405, we see nothing in that Act that prohibits the ICC staff from investigating environmental matters and preparing a draft impact statement, if needed, prior to any public hearings.
 
 IV.
 
 25
 We now turn to the adequacy of the tentative proposal of the CEQ. We had considered remanding this case to the district court for further hearings on this proposal since it initially appeared to meet the concerns expressed in Greene County I, especially since an alternative scheme of one hearing on the impact statement and one hearing on the proposal was suggested there. 455 F.2d at 421 n. 23. But it was conceded at argument that the administrative law judge would have no staff assistance in making the threshold determination of whether an impact statement is required. This emphasizes the dangers of reliance upon self-serving statements by the railroads and the placing of the burden of analyzing environmental issues upon intervenors.
 
 
 26
 Section 102(2)(B) of NEPA, 42 U.S.C. 4332(2)(B), provides that an agency shall identify and develop methods and procedures which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making. In Hanly v. Kleindienst, 471 F.2d 823 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (Hanly II), we held that this subsection as well as subsections (A) and (D) applies whether or not an impact statement is required. See also Hanly v. Mitchell, 460 F.2d 640 (2d Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) (Hanly I); Hanly v. Kleindienst, 484 F.2d 448 (2d Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974) (Hanly III). We said in Hanly II:
 
 
 27
 Since an agency, in making a threshold determination as to the 'significance' of an action, is called upon to review in a general fashion the same factors that would be studied in depth for preparation of a detailed environmental impact statement, 102(a)(B) requires that some rudimentary procedures be designed to assure a fair and informed preliminary decision. Otherwise the agency, lacking essential information, might frustrate the purpose of NEPA by a threshold determination that an impact statement is unnecessary.
 
 
 28
 471 F.2d at 835.
 
 
 29
 Following Hanly II, we do not see how the administrative law judge without any staff help can make a fair and informed preliminary decision on whether an impact statement is required. The ICC admits in its brief that the statements submitted by the railroads will not be unbiased, and the Commission cannot always count upon intervenors to raise essential issues. It seems clear to us that some staff investigation and evaluation will generally be necessary to make possible an informed threshold decision of whether an impact statement is required.
 
 
 30
 We realize that there have to be limits to what the ICC must investigate and consider under NEPA if it is to be capable of rendering a decision on any given matter. See Cramton & Berg, On Leading a Horse to Water: NEPA and the Federal Bureaucracy, 71 Mich.L.Rev. 511 (1973). The requirements of what the agency must consider in making the determination of whether an impact statement is necessary are governed by a rule of reason, similar to that used in determining whether certain matters must be considered in the impact statement itself. See Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972). But while we recognize there are limits to what may reasonably be expected from agency compliance with NEPA, we connot excuse the noncompliance with NEPA such as the ICC here seeks to justify.
 
 
 31
 We are reminded by Mr. Justice Harlan that guideline decisions 'suffer the danger of pitfalls that usually go with judging in a vacuum. However carefully written, they are apt in their application to carry unintended consequences which once accomplished are not always easy to repair.' Sanders v. United States, 373 U.S. 1, 32, 83 S.Ct. 1068, 1085, 10 L.Ed.2d 148 (1963) (dissenting opinion). It would therefore be inappropriate for us to suggest how much staff assistance the administrative law judge should have in individual cases before he makes the threshold decision of whether an impact statement is required. There may be cases in which no assistance would be necessary.[3] But we remind the ICC that under Hanly II it has an affirmative obligation to develop a reviewable record of this threshold determination, see 471 F.2d at 836, and its decision on this matter must be sufficiently reasoned so that a reviewing court can determine whether or not it was arbitrary or capricious, see 471 F.2d at 831.
 
 
 32
 Accordingly, the order of the district court is affirmed.
 
 
 
 [1]
 The ICC argues that the procedural rule at issue here is an 'order' because noncompliance with it can mean dismissal of an application and because the Commission will be bound by it. But this is generally the case with any procedural rule and the argument does not explain why this procedural rule merits extraordinary review by a three-judge court when other procedural determinations of the ICC do not
 
 
 [2]
 It was argued below that plaintiffs lack standing to make their claims. Judge Frankel held that they did have standing, 360 F.Supp. at 1064-1065, and the appellant has not repeated this argument on appeal. See generally United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 683-690, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 
 
 [3]
 Once procedures and principles become established, and precedents have been followed and approved, it will appear that many situations may require little or no staff work prior to an initial determination regarding the need for an impact statement